IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

AMY LEE SULLIVAN,

                         Plaintiff,                            OPINION AND ORDER

     v.

                                                            15-cv-298-wmc

FLORA, INC.,

                         Defendant.

Plaintiff Amy Lee Sullivan, a freelance illustrator, alleges defendant Flora, Inc., violated her copyrights by using illustrations in other advertisements and promotional materials that she created exclusively for its video projects. In its pending motion for summary judgment, defendant principally argues that the illustrations were joint works, and therefore Sullivan cannot assert claims as a sole author. (Dkt. #51.)[1] Perhaps recognizing potential weaknesses in her claim to sole ownership of a valid copyright, plaintiff's response leads with her evidence of infringement -- namely, recently-produced evidence that Flora had in its possession Sullivan's multi-layered, original source art, rather than simply JPEG images of the illustrations in dispute. While this evidence is material to the question of copying, perhaps compellingly so, it does not respond to the core issue raised in defendant's motion -- whether Sullivan owns a valid copyright -- the court takes up that issue in this opinion and order, finding that there are factual issues as to joint authorship that require a trial.

---

[1] Defendant also posits a defense based on certain of plaintiff's illustrations being derivative works, which is largely duplicative of defendant's joint authorship defense involving third-party Designomotion's contributions. Although offering a partial defense, the court will address this argument as well, finding that it does not provide a basis for granting summary judgment.

UNDISPUTED FACTS[2]

**A. Background**

Plaintiff Amy Lee Sullivan is an independent illustrator now living in Baraboo, Wisconsin, who sometimes does business as "Design Kit."  Her illustrations are either done by hand or on a Mac computer using software programs designed for creative professionals.  Sullivan began creating illustrations professionally in approximately 2010. She is listed as the sole author and creator of a collection of illustrations in two certifications of registration filed with the United States Copyright Office, registration numbers VA1-888-930 and VA1-893-717, although the parties dispute whether this is accurate.

Flora, Inc., is incorporated and maintains its principal place of business in the State of Washington, where it manufactures and distributes health-related products. Flora hired Designomotion, Inc., to produce two animated videos promoting Flora's products.  Designomotion's founder, sole owner and only full-time employee is Joseph Silver.

On February 3, 2013, plaintiff Sullivan was contacted by Designomotion's Silver to explore her interest in providing illustrations for an animated video for Flora. (Sullivan Decl., Ex. 3 (dkt. #56-3).)  In addition to Sullivan and Silver, other individuals also worked on the video.  The next day, Sullivan responded, indicating she was indeed interested.

---

[2] The following undisputed facts are derived from the parties' submissions on summary judgment, after resolving all material factual disputes and reasonable inferences in plaintiff's favor as the non-moving party.

On February 14, Silver sent Sullivan a script of the video he drafted, which included a column for "type" (*i.e.*, words for each screen) and "visual" (*i.e.*, visual content for each screen) of the planned video.  (Sullivan Decl., Ex. 4 (dkt. #56-4).)  In that same email, Silver also sent Sullivan a link to the "Girl Effect" video, based on Flora's expressed desire for the "black and white feel" of that video.[3]  (Def.'s PFOFs (dkt. #53) ¶ 45 (quoting Sullivan Depo. (dkt. #50) 67).)  In addition to asking Sullivan to review the video before creating her illustrations, Silver sent Sullivan an email the next day, which contained approximately 14 "rough sketches" of the proposed illustration work.  (Sullivan Decl., Ex. 5 (dkt. #56-5); Fallon Decl., Ex. 1 (dkt. #54-1).)  Those sketches appear to contain computer generated type with hand-drawn sketches.[4]

**B.  The Estimate**

That same day, February 15th, Sullivan responded with an email in which she "estimated the project at 5," meaning $5,000, and attached a document named "Estimate-7sources."  (Sullivan Decl., Ex. 7 (dkt. #56-17).)  Although the sole defendant in this case is Flora, not Designomotion, Sullivan relies on the terms of this Estimate in support of her argument that she is the sole author of the copyrighted illustrations.

The Estimate provides in part:

---

[3] The "Girl Effect" video is an animated video that had come out earlier that year.  *See* "The Girl Effect: The Clock Is Ticking," Youtube, https://www.youtube.com/watch?v=1e8xgF0JtVg (last visited Sept. 21, 2016).

[4] Rather than placing images of Silver's sketches and other relevant images, including the copyrighted illustrations, in the facts section, the court will include them below in the opinion, finding that it is more useful to place the images in comparison for purposes of analyzing whether Sullivan has a valid copyright.

> If the Client [designated as "Designomotion, Joseph Silver"] confirms that the Illustrator should proceed with the assignment based on this Estimate, it is understood that the assignment shall be subject to the terms shown on this Estimate and the Client shall sign a Confirmation of Assignment form incorporating the same specifications and terms.  If the assignment proceeds without a Confirmation of Assignment being signed by both parties, the assignment shall be governed by the terms and conditions contained in this Estimate.

(*Id.* at 2.)

The "Grant of Rights" section of the Estimate appears as follows:

3. **Grant of Rights.** Upon receipt of full payment, the Illustrator shall grant to the Client the following rights in the finished art:
For use as _____

| For the production named | 7 Sources Video | In the following territory: | Global |
|---|---|---|---|
| For the following time period : | In perpetuity | | |

**Other limitations**

With respect to the usage shown above, the Client shall have [ X ] exclusive [  ] nonexclusive rights.

If the finished art is for use as a contribution to a magazine, the grant of rights shall be first North American serial rights only, unless specified to the contrary above.

(*Id.*)

Finally, the Estimate states that:

- "All rights not expressly granted shall be reserved to the illustrator, including but not limited to all rights in sketches, comps, or other preliminary materials." (*Id.*)

- "[i]f the Client wishes to make any additional uses of the Work, Client shall seek permission from the Illustrator and pay an additional fee to be agreed upon." (*Id.*)

4

### C.  The 7-Sources Work

After agreeing by a February 21, 2013, email exchange to a budget range below that contained in Sullivan's original estimate, Silver sent Sullivan the final script and directed her to:

> mock up 1920x1080 (72dpi) layouts of the frames described in the script -- and which I scribbled for you.  Font-wise, we would be using Wicked Grit, which I can supply.  I'd be coming to you for illustration and your eye in combining the illustration with the typography.  I would aim to provide pretty detailed direction to save your time.

(Sullivan Decl., Ex. 8 (dkt. #56-8); Fallon Decl., Ex. 2 (dkt. #54-2) 5-6 (final script).) As the actual client, Flora specified the size and layout of the frames described in the script, as well as use of the "Wicked Grit" font.[5]

In addition to the materials from Silver, Sullivan received a folder of "assets" from Flora, which included prior advertising materials.  In particular, Flora provided an advertisement of a screw with the words "WE'VE BEEN SCREWED" and a photograph of the 7-Sources product bottle, including its label.  (Fallon Decl., Ex. 3 (dkt. #54-3).) Sullivan reviewed this advertisement before creating the illustration for the "SCREWED" frame.  Before illustrating a 7-Sources bottle, Sullivan also reviewed the photograph in the advertisement of an actual 7-Sources bottle, as well as a physical bottle.

In her declaration, Sullivan describes in great detail her process for creating the illustrations at issue in the Flora 7-Sources project, including conducting background

---

[5] The Wicked Grit font appears to be available free on-line.  *See* Google search of "wicked grit font," https://www.google.com.  In any event, Sullivan is not claiming its use to be part of her copyright.

research on various objects, creating rough sketches on a chalkboard, creating an art board within Adobe Illustrator, which included use of a tablet with a pen, creating a new layer for each new art element, creating a color palette, and laying out typography, among other steps.  (Sullivan Decl. (dkt. #56) ¶¶ 25-27.)  There is no dispute that Sullivan included a representation of the Flora logo in her illustration of the 7-Sources bottle based on the bottle images that she had looked at, intending for the representation to be recognizable as the Flora logo.

On March 13, Sullivan sent Designomotion an invoice for $2,500 for the "Illustration for Flora 7 Sources."  (Sullivan Decl., Ex. 9 (dkt. #56-9).)  These illustrations created by Sullivan are the same as those registered in the '930 copyright.

### D. Flor-Essence Work

In April or early May 2013, Sullivan was commissioned by Silver to create illustrations for a second Flora video, the Flor-Essence video.  For this project, Silver again sent Sullivan approximately two dozen preliminary sketches, though these images contain more computer-generated content than the rough hand-drawn sketches provided as part of the 7-Sources project.  (Fallon Decl., Ex. 5 (dkt. #54-5).)[6]  Also similar to the 7-Sources project, Silver provided Sullivan with a script for the Flor-Essence video project, which similarly indicated places for "type" and "visual" by frame.  (Fallon Decl.,

---

[6] The parties agree that the sketches provided to the court include certain handwritten notes by Sullivan and that the image of the 7 Sources bottle in a few of the sketches is the one Sullivan had prepared for the 7-Sources video.  (Def.'s Reply to Def.'s PFOFs (dkt. #62) ¶¶ 49-50.)  Sullivan's additions are difficult to see in the copy provided to the court.  For purposes of summary judgment, the court will assume that Silver sent Sullivan sketches without those additions but that version of the document was not preserved.  Regardless, there is no dispute that Silver sent Sullivan a four-page document containing approximately 23 rough illustrations.

Ex. 6 (dkt. #54-6).)   Sullivan used the visual column of the script to guide the illustration of the frames of the Flor-Essence video, and the type column contained the actual words she formatted into those frames.  Here, too, Sullivan used the Wicket Grit font, as directed by Flora.

Specific to this project, Sullivan received reference materials from Flora containing images of "Great 8" plants.   (Fallon Decl., Ex. 7 (dkt. #54-7).)   While Sullivan acknowledged that she needed images of the plants to create the illustrations, she nonetheless testified at her deposition that she did not use the images provided by Flora. Instead, she claimed to have "probably used several sources," and more specifically that she "Googled the plant names and looked at images of that particular plant."  (Sullivan Depo. (dkt. #50) 95.)

Sullivan completed this project in May 2013 and submitted an invoice dated June 3, 2013, for $3,000 to Designomotion for payment.  The images Sullivan created are the same as those registered in the '717 copyright.  The invoice included the following terms and conditions:

> Any usage rights not exclusively transferred are reserved to the illustrator.  Usage beyond that granted to the Client her[e]in shall require payment of a mutually agreed-upon additional fee subject to terms.
>
> Rights Transferred: For use in 1:30 animated spot for web and TV.
>
> Duration of Usage: In perpetuity
>
> Limitations of media in which used: Video for web and television
>
> Limitations on geographical use: none

> Grant of reproduction rights is conditioned on receipt of payment.

(Sullivan, Dec., Ex. 10 (dkt. #56-10).)

For both projects, in addition to providing the illustrations in JPEG file format, Sullivan also provided her original, multi-layered source art.  In particular, Sullivan delivered to Silver files that included 36 multi-layered source art files for the 7-Sources project, and 54 multi-layered source art files for the Flor-Essence project.

### E.  Copyright Registrations

On November 6, 2013, Sullivan registered the copyright for "7 Sources Illustration Collection," Registration No. VA 1-888-930, as the sole author.  Flora points out that she did not complete "Space 6:  Derivative Work or Compilation."  Sullivan does not dispute this, but contends this was because the illustrations were not derivative or a compilation.  The '930 copyright registration identifies 14 "frames," a 7S-Bottle Illustration, a Storyboard and "AmyTex" as the contents.  (Sullivan Decl., Ex. 1 (dkt. #56-1).)

On December 12, 2013, Sullivan registered the copyright for "FEV Illustration Collection," Registration No. VA 1-893-717, also as the sole author.  Here, too, Flora points out that Sullivan did not complete Space 6, and Sullivan responded similarly.  The '717 copyright identifies 12 frames, a "Farm," "Herbs," Amy Tex" and "Amy Tex Bubble" as the contents.  (Sullivan Decl., Ex. 2 (dkt. #56-2).)

In addition to the illustrations, for both of the copyright registrations, Sullivan also registered a background texture. (*See* Sullivan Decl., Ex. 1 (dkt. #56-1) 20; *id.*, Ex. 2 (dkt. #56-2) 18-19.)

### F. Alleged Copying

Sullivan alleges that the illustrations that she specifically created for the 7-Sources and Flor-Essence videos were used in other promotions and advertisements, including the Floradix video, foreign language versions of the Flor-Essence video and other online promotional advertising.

OPINION

In order to prove copyright infringement, Sullivan must establish two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Janky v. Lake Cnty. Convention & Visitors Bureau*, 576 F.3d 356, 361 (7th Cir. 2009) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Servs. Co.*, 499 U.S. 340, 361 (1991)). As described above, the focus of this opinion -- consistent with the focus of defendant's motion for summary judgment -- is on the first element. "To qualify for copyright protection, a work must be original to the author. Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Feist Publ'ns, Inc.*, 499 U.S. at 345.

Because Sullivan obtained certifications of registration for both the 7-Sources illustrations and for the Flor-Essence illustrations within five years of their first

9

publications, those registrations constitute prima facie evidence of the "validity of the copyright and of the facts stated in the certificate." *See* 17 U.S.C. § 410(c).  Still, the presumption of validity is a rebuttable one, with the burden falling on defendant to prove that a copyright is not valid.  *Mid Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995) ("We note, however, that this is simply a rebuttable presumption.").

In light of the fact that this is defendant's motion on an issue for which it bears the burden of proof, to grant summary judgment defendant "must lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim."  *Hotel 71 Mezz Lender LLC v. Nat'l Retirement Fund*, 778 F.3d 593, 601 (7th Cir. 2015).  For the reasons that follow, defendant does not meet this high hurdle.

## I.  Joint Work[7]

Here, defendant Flora principally contends that Silver[8] and Sullivan are joint authors of the illustrations contained in the '930 and '717 registrations as a matter of

---

[7] Before turning to the question of whether the illustrations constitute a joint work, the court notes that Sullivan registered the two sets of illustrations as collections, apparently treating each set as a single work.  *See* 37 C.F.R. § 202.3.  While the parties point to specific illustrations or images in support of their respective arguments on joint authorship, consistent with the parties' approach, the court is evaluating the legal question of copyrightability in view of the entire collection, not each, individual discrete illustration.  As such, the court sees no basis to consider defendant's discrete challenge based on the background as an element of the collections, at least at this time.

[8] The court opts to refer to the alleged joint author as Silver, rather than Designomotion, but there seems to be no material distinction for purposes of determining joint authorship between Silver and his wholly-owned corporate entity.

law.  Title 17 U.S.C. § 201(a) provides that "[t]he authors of a joint work are co-owners of copyright in the work."  As such, "the joint authors hold undivided interests in [the] work, despite any differences in each author's contribution."  *Janky*, 576 F.3d at 361 (quoting *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1068 (7th Cir. 1994)).  As joint authors, both authors may use or license the joint work.  *Id.*  Moreover, if Silver is a joint author, then Sullivan does not own the copyright exclusively, and Flora would have a right to use the illustrations with Silver's permission.  *See Janky*, 576 F.3d at 361 ("The question is, was Janky the only author? If not—if Farag was a co-author—then Janky does not own the copyright exclusively, and the Bureau had a right to use the song with Farag's permission.").

In *Erickson v. Trinity Theatre, Inc.*, the Seventh Circuit considered the language of 17 U.S.C. § 101, defining a "joint work" and determined that to satisfy that definition, there must be "(1) intent to create a joint work; and (2) contribution of independently copyrightable material."  *Janky*, 576 F.3d at 362 (citing *Erickson*, 13 F.3d at 1068, 1071). The first is generally an issue for the jury, while the second is for the court to determine. *See Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.*, 290 F.3d 98, 110 (2d Cir. 2002) ("[a]uthorship is generally a question for the jury"); *Janky*, 576 F.3d at 363 (citing *Gaiman v. McFarlane*, 360 F.3d 644, 648 (7th Cir. 2004) (finding for defendant on the undisputed facts as to joint authorship, while concluding that "copyrightability is always an issue of law").  The court will consider each element in turn.

### A. Intent to Create a Joint Work

As for the first element, the Seventh Circuit in *Erickson*, and reinforced in *Janky*, explained that:

> the intent prong does not have to do with the collaborators' intent to recognize each other as co-authors for purposes of copyright law; the focus is on the parties' intent to work together in the creation of a single product, not on the legal consequences of that collaboration.

*Id.* (citing *Erickson*, 13 F.3d at 1068-69).   Moreover, Sullivan's position now is of no import; instead, the question is whether Sullivan and Silver and/or Flora "intended to be joint authors *at the time the work was created*."  *Id.* (citing *Erickson*, 13 F.3d at 1070).

*Erickson* and *Janky* provide additional guidance on determining this issue of intent. In *Erickson*, the court considered whether three copyrighted plays, each a compilation of scenes and sonnets from Shakespeare and other writers of his time, were joint works between the playwright and certain actors.  *Erickson*, 13 F.3d at 1063, 1071-72.   The court first considered two of the plays together, finding that neither presented a close question on intent.  For the first play, the court found that one actor's suggestion that the playwright include a passage from *Macbeth* and add an introduction to the play did not render him a joint author, especially given that he conceded the playwright determined whether his contributions were included.   *Id.* at 1072.  As for the second play, the court similarly relied on the fact that the playwright "decided which of the actors' suggestions were incorporated into the script" to conclude that there was no intent that the actors be considered joint authors.  *Id.* at 1072.  With respect to the third play, however, there was evidence that at least two of the scenes "were developed through

12

a collaborative process," and initially, the playwright even credited that actor as an author of that play.  *Id.*  As such, the court found that the third play passed the intent hurdle, though as explained below, it failed on the second element of showing that the actor's contribution was independently copyrightable.  *See id.*

In *Janky*, the court considered whether a song was a joint work.  The plaintiff, Janky, wrote the music and lyrics for a song she called "Wonders of Indiana."  *Janky*, 576 F.3d at 359.  The song was commissioned by the defendant Lake County Convention and Visitors Bureau to promote tourism in Lake County, Indiana.  Janky then showed the song to Farag, one of the other members of her doo-wop group.  Farag "recommended revising the lyrics to better suit the Bureau's vision."  *Id.* at 360.  Janky agreed to make those changes, and testified that Farag's recommendations "accounted for 10 percent of the lyrical content."  *Id.*  With those revisions in place, Janky filed a new copyright registration, listing Farag as a co-author, but then claimed that her representation of joint authorship in the new copyright registration was a mistaken attempt "to express her gratitude."  *Id.* at 362.  In light of this "post hoc rationalization," as well as the fact that Farag made "significant contributions" and "wielded considerable control over what the song finally looked like," the court was unpersuaded, finding that the intent element was satisfied.  *Id.*

From these two cases, the court finds that evidence of a significant contribution and some measure of control forms a sufficient basis for inferring intent to produce a joint work.  In contrast, Sullivan mainly relies on a district court case from New York in support of her argument that neither Silver nor Flora are joint authors.  In *SHL Imaging,*

*Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301 (S.D.N.Y 2000), the court rejected the argument by defendant, a manufacturer of picture and mirror frames, that it was a joint author of the copyrighted work -- photographs of the frames.  The court explained that "the copyrighted works at issue are the photographs, not the frames," and that the "[m]ere selection of the subject matter to be photographed" or "ownership of the physical embodiment of a work" by itself "does not create joint authorship."  *Id.* at 315.  While this case may be helpful in considering Flora's possible role as a joint author in simply providing a bottle of one of its products or photographs of common plants, the facts in *SHL Imaging* are readily distinguishable from the facts here, involving Silver's more substantial contribution and control over what was ultimately submitted to Flora (the close analogue to the manufacturer in *SHL Imagining*).  Indeed, the court is hard-pressed to analogize in any way Silver's contribution and role to that of the frame manufacturers in this case.

Sullivan also relies heavily on the language in the Estimate described in the fact section above, granting only a right to use the illustrations in the respective videos, and limiting any other use.  The fact that Sullivan attempted to describe her and Designomotion's respective legal rights in an estimate attached to an email appears of limited weight for at least two reasons.  *First*, it is uncertain if Silver even opened the attachment or otherwise reviewed it.  Rather, Silver appeared focused solely on the amount of money Sullivan would charge to complete the work, consistent with his request for an *estimate*.  Indeed, in his email response, Silver simply thanks Sullivan for "the note," without referencing anything about an attachment.  (Sullivan Decl., Ex. 8

14

(dkt. #56-8) 2.)   During his deposition, Silver simply testified that he "recall[ed] an estimate in a body of an email."  (Silver Depo. (dkt. #43) 61; *id.* at 64 ("She got back to me with an email.  In the body of the email, she included an estimate.  And on that basis, I rejected her estimate.").)  However, Silver did not sign the actual Estimate or any other contract, including an assignment contemplated in the Estimate.  To the extent that the Estimate could be seen as an offer, Silver rejected Sullivan's offer, and negotiated an amount of half that offered by Sullivan.  Moreover, except for the terms and conditions included on the invoice, there is no similar purported assignment of rights with respect to the Flor-Essence project.  In sum, there is no evidence compelling a finding that the estimate was a negotiated agreement or otherwise reflects the Sullivan and Silver's intent not to work collaboratively on these illustrations.  Indeed, absent such evidence, the trier of fact will have to assess whether Silver's failure to raise any concern with the terms and conditions in the Estimate has any bearing on his intent that this not be a collaborative work.

*Second*, and perhaps more critically, Sullivan's assertion of certain legal rights and an attempt to carve out her rights under copyright law is not controlling, or perhaps even material.  As *Janky* explained, the question of intent to create a joint work "does not have to do with the collaborators' intent to recognize each other as co-authors for purposes of copyright law."  536 F.3d at 362.  Instead, the focus is on "the parties' intent to work together in the creation of a single product."  *Id*.  More probative is Sullivan's own contemporaneous statement at the outset of the 7-Sources project describing the work with Silver as a "collaboration" -- although she testified at her deposition that she used

that term in humor.  (Sullivan Depo., Ex. 6 (dkt. #56-6); *see also* Pl.'s Resp. to Def.'s PFOFs (dkt. #58) ¶ 12.)

Even putting aside how Sullivan and Silver characterize their working relationship (either contemporaneously or in more recent court filings), perhaps the best evidence of their intent to collaborate is in Silver's contribution, *some dictated by Flora*, of frame-by-frame sketches, frame-by-frame text, input on the overall impression or feel of the illustrations with reference to the Girl Effect video, selection of the font, and direction on layout and size.  *See Janky*, 576 F.3d at 362 (finding "post hoc rationalization . . . at odds with the significant contributions made by Farag"); *see also Thomson v. Larson*, 147 F.3d 195, 201 (2d Cir. 1998) ("[C]o-authorship intent does not turn solely on the parties' own words or professed state of mind," instead such a determination involves a "nuanced inquiry into factual indicia of ownership and authorship.").  Indeed, when viewed in context, Silver, not Sullivan, appears to have greater control over the ultimate work Sullivan would copyright, as the principal interpreter of Flora's desired product and arbiter as to what would be submitted to Flora for approval.

In its briefs, defendant presents images of Silver's sketches and video scripts juxtaposed against the copyrighted illustrations to demonstrate the extent of Silver's contribution and control over the final illustrations.  Table 1 shows Silver's original sketches for the 7-Sources project next to the finished, copyrighted collection of illustrations:

| Frames from Ms. Sullivan's U.S. Copyright Registration No. VA 1-888-930 | Excerpts from Exh. 58 to Sullivan Deposition, Declaration of Steven P. Fallon (the "Fallon Declaration") at ¶ 3 (Sketches of Mr. Silver of Designomotion) |
|---|---|
|  |  |
|  |  |
|  |  |





(Def.'s Br. (dkt. #52) 9-11.)

Silver's script of the video provides additional support for a finding that Silver significantly contributed to and controlled the 7-Sources illustrations:

| Frame from Ms. Sullivan's U.S. Copyright Registration No. VA 1-888-930 | Excerpt from Exh. 61 to Sullivan Deposition, Fallon Declaration at ¶ 4 (Visual Script from Mr. Silver of Designomotion) |
|---|---|
| *(image of screw graphic)* | Pan to next sentence.<br><br>Giant screw falls into middle of sentence, displacing letters and causing them to fall over. |

| Frame from Ms. Sullivan's U.S. Copyright Registration No. VA 1-888-930 | Excerpt from Exh. 61 to Sullivan Deposition, Fallon Declaration at ¶ 4 (Text from Mr. Silver of Designomotion) |
|---|---|
| WE ALL NEED OMEGA FATTY ACIDS FOR: **HEALTH WELLBEING** AND **BRAIN FUNCTIONS** | We all need omega fatty acids for: HEALTH WELLBEING BRAIN FUNCTIONS |

(*Id.* at 13, 14.)

The same is true with respect to the sketches Silver provided to Sullivan as part of the Flor-Essence project.



20




































(*Id.* at 22-25.)

Similarly, the Flor-Essence script drafted by Silver was incorporated into the final illustrations:

| Frames from Ms. Sullivan's U.S. Copyright Registration No. VA 1-893-717 | Exh. 82 to Sullivan Deposition, Fallon Declaration at ¶ 8 (Visual Script from Mr. Silver of Designomotion) |
|---|---|
|  | Zoom into the tops of a few smokestacks. Dark clouds contain crossbones and radiation symbols. Type embedded inside a dark cloud. |
|  | One cloud appears with the phrase 'in the air we breathe'. Right before the transition, another cloud appears with a big '&'. The clouds are sucked into a giant, dark mouth – a very abstracted mouth with just enough detail to show it belongs to a person. |
|  | Other objects of food and drink vanish into the dark mouth, including sickly looking fish, nuts, and a bottle (any other relevant objects here?). On the food items, we read 'in what we eat', and on the bottle we read 'and drink'. |
|  | We see the silhouette of a body, filled with crossbones and radiation. |

(*Id.* at 26.)

Looking at the extent of Silver's contributions to the content, images and their placement, were it not for Sullivan benefiting from the presumption created by the copyrights themselves, the defendant would be entitled to summary judgment in favor of joint authorship. In *Janky*, the court affirmed the grant of summary judgment in the defendant's favor on its challenge to the validity of the plaintiff's copyright based on joint ownership. In that case, unlike here, the court also had the benefit of plaintiff's copyright registration acknowledging Farag's contribution. *See Janky*, 576 F.3d at 362 (noting that "billing or credit may be evidence of intent to create a joint work" (internal citation and quotation marks omitted)). While the court finds defendant's evidence and argument persuasive on the intent prong of the joint authorship test as to Silver, a jury will be allowed to hear testimony and argument on this issue before the court renders its final decision in the form of a ruling on directed verdict or, more likely, motion after verdict.

Consistent with the parties' approach on summary judgment, the court's focus until now has been on Silver as a joint author. The evidence of Flora as a joint author is significantly more limited, especially considering Sullivan appears to have had no contact with *any* Flora employee until after Sullivan completed her work for Designomotion, indeed until approaching Flora with concerns of copyright infringement. Given this dynamic, Flora's status as a joint author appears to hinge on Silver's status as a joint author. Stated another way, absent a showing that Silver and Sullivan intended to collaborate on these two collections of illustrations, there would be no basis for finding

25

that Sullivan and Flora intended to collaborate.  Moreover, given the holding in *Janky* that Janky's co-author Farag could grant the Bureau rights to the song, there seems no reason even to decide if Flora could be viewed as a co-author in order to use or continue to use the illustrations in other promotional materials and advertisements.[9]

Regardless, the court need not consider whether the parties intended for Flora to be a co-author, considering that its contribution considered in light of the collections of illustrations, each viewed in their entirety, does not appear to be independently copyrightable.

### B.  Independently Copyrightable Contribution

As for the second element of joint authorship identified in *Erickson*, the Seventh Circuit rejected a "more than de minimis" requirement, instead requiring that to constitute a joint work, each contribution must be "independent copyrightable."  13 F.3d at 1070-71.  This holding was reiterated in *Janky*.  576 F.3d at 361-63.  Here, too, the lines drawn in *Erickson* and *Janky* provide guidance.[10]

With respect to the one play for which the court found an intent to produce a joint work, in *Erickson* the court concluded that the actor's contributions to the play

---

[9] Now, if Silver were to receive proceeds from Flora for its use of the illustrations, then Silver would be obligated to account to his co-author Sullivan for any profits.  *Erickson*, 13 F.3d at 1068 (citing 17 U.S.C. § 201).

[10] After *Erickson*, but before *Janky*, the Seventh Circuit carved out an exception that does not appear to apply here -- at least, defendant has not developed an argument in support of the exception.  *See Gaiman v. McFarlane*, 360 F.3d 644, 659 (7th Cir. 2004) (relaxing independently copyrightable requirement in instances where "[t]he finished project is copyrightable, yet . . . none of the separate contributions of the . . . collaborating artists would be").

"were not independently copyrightable," finding that such "[i]deas, refinements and suggestions, standing alone are not the subject of copyrights." 13 F.3d at 1072. In contrast, while acknowledging that it was a "close case," the *Janky* court found that Farag's contributions to the tourism song "went beyond" that provided by the actor in *Erickson*: "They were concrete expressions and thus pass the test of copyrightability where mere ideas fail." 576 F.3d at 363. The court went onto explain:

> while Farag's changes may have accounted for only 10 percent of the lyrics, they were significant. They were important not only to the final sound, but also to its commercial viability. Before Farag became involved, the song celebrated the charm of Indiana as a state; Farag shifted the focus to Lake County. Without Farag's input, it is unlikely that the Bureau would have embraced the song the way it did.

*Id.*

Given the obvious similarities of Silver's role with Flora to that of Farag's role with the Bureau, Sullivan understandably directs the court to cases in support of the general proposition that "the person providing the rough sketches is not an author." (Pl.'s Opp'n (dkt. #55) 19-20 (quoting *Fleming v. Miles*, 181 F. Supp. 2d 1143, 1156 (D. Or. 2001)).) These cases, however, are either distinguishable or do not provide the support plaintiff seeks. For example, in *Fleming*, the focus of the court's discussion was on whether the *graphic designer* -- not the plaintiff who provided sketches and ideas for album art -- was an author. 181 F. Supp. 2d at 1156 (concluding that the graphic designer in modifying designs and creating new artwork based on instructions "played a significant role in the design process and physically created the final product"). Indeed, the district court

27

concluded that a trial was necessary to determine whether the plaintiff who provided the sketches was a joint author.  *Id.*

Another case cited by plaintiff, *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486 (11th Cir. 1990), is distinguishable based on the very limited contribution of a "thumbnail sketch" of a floorplan relative to the final product of architectural drawings for a new home.  *Id.* at 1493 ("Ballough's contribution to the final drawings produced by Unlimited was a thumbnail sketch of the floor plan he desired for the 'Islander II' and approval authority thereafter."); *see also Kendall Holdings, Ltd. v. Egen Cryogenics LLC*, 630 F. Supp. 2d 853, 866 (S.D. Ohio 2008) (finding defendant's evidence, consisting of "vague statements about contributing drawings and charts does not rebut the presumption created by Plaintiff's certificate of registration"); *BancTraining Video Sys. v. First Am. Corp.*, 956 F.2d 268, 1992 WL 42345, at *3 (6th Cir. Mar. 3, 1992) (unpublished) (holding that mere "supervision of the production and [provision of] ideas for the videotapes" was not enough to find defendant a joint author).

Here, defendant has put forth compelling evidence that Silver's preliminary sketches and script for each collection of illustrations were concrete expressions, beyond mere ideas, refinements and suggestions, and therefore independently copyrightable.  *Cf. Vent v. Mars Snackfood US, LLC*, 611 F. Supp. 2d 333, 339 (S.D.N.Y.), *aff'd*, 350 F. App'x 533 (2d Cir. 2009) (finding plaintiff's advertising idea "general and undeveloped," specifically noting that "[s]he did not draft any examples or sketches of the advertisement, did not specify the medium that the advertisement would take, and did not write a script").  Even if not independently copyrightable, there is at least room to

argue that without Silver's contributions, Sullivan's work would be equally lacking.  *See Gaiman*, 360 F.3d at 659 (relaxing independently copyrightable requirement in instances where "[t]he finished project is copyrightable, yet . . . none of the separate contributions of the . . . collaborating artists would be").  Regardless, because a jury trial is necessary on the question of intent, the court will hold open this legal issue for the court as well.

## II. Derivative Works

In addition to the joint authorship challenge, Flora also seeks summary judgment on certain images based on preexisting works, namely the "Screwed" advertisement which informed the "Screwed" frame in the '930 registration, the Flora bottle, including its label and logo, and photographs of the "Great 8" plants.[11]  As far as the court can tell -- and defendant's argument based on derivative works theory is difficult to follow -- defendant contends that:  (1) Sullivan's illustrations containing these items are not sufficiently original to render them copyrightable; and (2) even if copyrightable as derivative works, Sullivan's failure to disclose the preexisting works renders her registrations invalid.[12]

The Copyright Act defines a "derivative work" as:

> a work based upon one or more preexisting works, such as a
> translation,      musical      arrangement,      dramatization,

---

[11] Defendant also posits an argument based on Sullivan's illustrations being derivative works of Silver's sketches and scripts.  The court views this as an alternative version of the joint authorship defense, which appears stronger and more consistent with the facts at issue in this case. Accordingly, the court has only considered the derivative works challenge with respect to Flora's preexisting works.

[12] Defendant also may be arguing that Flora's subsequent use of these images cannot constitute copying because of Flora's pre-existing works.  Defendant is correct that if Sullivan's illustrations are derivative works, her copyright only covers her incremental contribution.  This defense, however, concerns the second prong of plaintiff's infringement claim -- copying -- and that, too, requires a jury determination.

> fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".

17 U.S.C. § 101.  An author of a derivative work is entitled to "copyright protection in the *incremental original expression* he contributes as long as the derivative work does not infringe the underlying work." *Schrock v. Learning Curve Int'l, Inc.*, 586 F.3d 513, 518 (7th Cir. 2009) (citing 17 U.S.C. § 103(a)).[13]  "The copyright in a derivative work, however, 'extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work." *Id.*  In *Schrock*, the court clarified that there is no higher standard of originality for purposes of determining whether a derivate work is entitled to copyright protection; rather, "[t]he test of originality is concededly one with a low threshold in that all that is needed is that the author contributed something more than a merely trivial variation, something recognizably his own." *Id.* at 521 (internal citation and quotation marks omitted).

In support of its argument that Sullivan's illustrations are not entitled to copyright protection, defendant again submits the images of Flora's preexisting works -- the "screwed" advertisement, the 7-Sources bottle, Flora's logo, and the "Great 8" plants juxtaposed with Sullivan's illustrations.   Here, however, the evidence is far less compelling.

---

[13] To be non-infringing, the author of the derivative work need only "have permission to make the work from the owner in the underlying work," and need not have permission to copyright the derivative work.  *Schrock*, 586 F.3d at 523.



(Def.'s Br. (dkt. #52) 16.)



(*Id.* at 17.)

| Excerpt from Frame from Ms. Sullivan's U.S. Copyright Registration No. VA 1-888-930 | Flora's U.S. Trademark Reg. No. 3,118,778 Fallon Declaration at ¶ 6 |
|---|---|
|  |  |

(*Id.* at 18.)

| Excerpts from Frames from Ms. Sullivan's U.S. Copyright Registration No. VA 1-893-717 | Excerpts from Exh. 86 to Sullivan Deposition, Fallon Declaration at ¶ 9 (Flora Great 8 Reference Material) |
|---|---|
| BLESSED THISTLE | **Blessed Thistle** (Cnicus benedictus) helps alleviate indigestion caused by liver congestion. It has long been used as a digestive tonic and a diaphoretic to support skin detoxification. This thorny plant contains B-complex vitamins as well as calcium, iron, and manganese. |
| WATERCRESS | **Watercress** (Nasturtium officinale) is a rich source of chlorophyll, vitamins A and C, antioxidants, and many minerals. Traditionally used for its detoxifying and restorative properties, it contains indoles, which deactivate and eliminate excess estrogen from the body. Watercress also |
| BURDOCK ROOT | **Burdock Root** (Arctium lappa) is a cleansing antioxidant that promotes a strong immune system, stimulates good digestion, and supports all the elimination pathways of the body.* Active ingredients include inulin, calcium, iron, potassium, tannin, mucilage, flavonoids, and essential oils. The bitter properties of this herb are important for liver detox and function.* |
| TURKISH RHUBARB | **Turkish Rhubarb Root** (Rheum palmatum) provides detoxification support to the digestive system, colon, and liver. It also helps minimize the risk of abnormal cell division by impeding the proliferation of harmful micro-organisms. Mineral content includes calcium, iron, magnesium, zinc, potassium, and selenium as well as vitamins B, C, and E. |
| SLIPPERY ELM | **Slippery Elm Bark** (Ulmus rubra) supports the skin, kidneys, and urinary and respiratory systems in their natural elimination processes.* It is used to soothe inflammatory irritations and minor gastrointestinal ailments by absorbing toxins from the bowels.* It also soothes the digestive tract because of its mucilage content, and it alkalizes the body by balancing pH in the gastrointestinal tract.* |



(*Id.* at 29-30.)

With the exception perhaps of the Flora logo, the court finds that Sullivan's contributions constitute more than a "merely trivial variation" of the underlying, preexisting works. *Schrock*, 586 F.3d at 521. As already alluded to, defendant has a more profound problem with its efforts to pick off these discrete images: each is part of only certain illustrations. Defendant fails to explain or develop any argument as to how Sullivan's reliance on Flora's preexisting works with respect to specific, discrete images would render the *collection* of illustrations as a whole derivative. While courts have found that "copyright protection does not extend 'to derivative works if the pre-existing work

34

*tends to pervade* the entire derivative work,'" defendant does not, and cannot credibly, argue that this is the case here. *Sobhani v. @Radical.Media Inc.*, 257 F. Supp. 2d 1234, 1239-40 (C.D. Cal. 2003) (quoting 3 *Nimmer on Copyright* § 3.06 (2002)).

*Second*, defendant argues that plaintiff's registrations are invalid because she failed to disclose Flora's underlying, preexisting works, citing 17 U.S.C. § 411(b).  That provision provides:

> (b)(1) A certificate of registration satisfies the requirements of this section and section 412, regardless of whether the certificate contains any inaccurate information, unless--
>
> (A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and
>
> (B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration.

There are two core problems with this defense.  Consistent with the express language of the provision, to find a copyright registration invalid based on "inaccurate information," defendant would first need to prove that Sullivan knew that the information was inaccurate.  As described above, Sullivan's claimed failure to disclose preexisting works turns on a determination of whether use of certain images in some of her illustrations renders the entire collection of images a derivative work.  Even if defendant had developed this legal argument, the court would be hard-pressed to find that the omission of such evidence constitutes a knowing misrepresentation, rather than just a mistake based on a misunderstanding of the law.  The two cases defendant cites in support actually illustrate the type of misinformation required to satisfy this requirement, and they are readily distinguishable from the omissions claimed here. *See R. Ready Prods.,*

*Inc. v. Cantrell*, 85 F. Supp. 2d 672, 692 (S.D. Tex. 2000) (finding a knowing misrepresentation where copyright registrant failed to disclose that the "overall concept behind and numerous elements of Plaintiffs' registered works are plainly copied from existing works by The Ritz Corporation and Presidential"); *GB Mktg. USA Inc. v. Gerolsteiner Brunnen GmbH & Co.*, 782 F. Supp. 763, 775 (W.D.N.Y. 1991) (finding a knowing misrepresentation where copyright registrant of an illustration of a label failed to disclose the label itself).

Even if the court were in a position to resolve at summary judgment the issue of whether Sullivan knowingly failed to disclose Flora's preexisting works, there is a second problem. The Seventh Circuit advises that determinations of materiality of an omission are for the Register of Copyrights. *See DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 625 (7th Cir. 2013) (discussing 17 U.S.C. § 411(b)(2)). As a result, "courts can demand that the party seeking invalidation first establish that the other preconditions to invalidity are satisfied before obtaining the Register's advice on materiality." *Id.* Not only has defendant failed to make such a showing, but it has not asked the court to seek a determination on materiality from the Register of Copyrights. On this record, therefore, the court must reject defendant's challenge to copyrightability based on Sullivan's failure to disclose preexisting works on her application.

## III. Next Steps

Consistent with the above discussion, a jury trial will be necessary in this case. Before that, however, the court must address defendant's challenge to the scope of permissible damages raised in various discovery disputes before this court. In light of the

court's schedule, and the possibility that the parties might need some limited time to complete discovery on damages, the current schedule will be stricken and an in-person hearing will be scheduled to address any remaining discovery issues and establish a new, reasonably prompt trial date.

## ORDER

IT IS ORDERED that:

1) Defendant Flora, Inc.'s motion for summary judgment (dkt. #51) is DENIED.

2) The current schedule, including the trial date, is STRICKEN.

3) An in-person hearing will be held on Friday, October 14, 2016, at 1:30 p.m. to address any remaining discovery issues and establish a new trial date.

Entered this 7th day of October, 2016.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

37