IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

AMY LEE SULLIVAN,

                           Plaintiff,                    OPINION AND ORDER

    v.

                                                         15-cv-298-wmc

FLORA, INC.,

                           Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

While the jury was deliberating on the phase II liability verdict, the court heard evidence and argument on issues concerning plaintiff's damages case. The court then issued certain rulings, which resulted in the exclusion of specific expert testimony and argument on certain of plaintiff's damages theories in keeping with defendant's pending motions in *limine*. The purpose of this order is simply to formalize those rulings.

## I. Plaintiff's Damages Theory Based on Defendant's Profits

Title 17 U.S.C. § 504(b) sets forth remedies for copyright infringement, including that the "copyright owner is entitled to recover . . . any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." The purpose of allowing an award of defendant's profits in addition to the plaintiff's actual damages is to "prevent the infringer from unfairly benefiting from a wrongful act." 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.03 (Matthew Bender, Rev. Ed.); *see also McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 568 (7th Cir. 2003) ("by disgorging any net profits from the infringer, lost profit damages eliminate a major incentive to steal the copyright instead of fairly negotiating for its use with the owner").

To be entitled to such an award, however, plaintiff must, at minimum, prove a causal connection or nexus between the infringement and defendant's gross revenues. *See Bell v. Taylor*, 827 F.3d 699, 710 (7th Cir. 2016) ("[A] plaintiff must show a causal nexus between the infringement and the gross revenues."); *Taylor v. Meirick*, 712 F.2d 1112, 1122 (7th Cir. 1983) ("If General Motors were to steal your copyright and put it in a sales brochure, you could not just put a copy of General Motors' corporate income tax return in the record and rest your case for an award of infringer's profits.").

Here, where the sales are *not* of the infringing products themselves, like a t-shirt, book cover or poster with the copyrighted work on it, but rather of infringing advertising, plaintiff's burden to prove a casual nexus is admittedly much more challenging, because it involves proof based on indirect profits. *See O'Connor v. Cindy Gerke & Assocs., Inc.*, 300 F. Supp. 2d 759, 771-72 (W.D. Wis. 2002) (discussing *Mackie v. Rieser*, 296 F.3d 909, 915 (9th Cir. 2002)); *see also Univ. of Colo. Found. v. Am. Cyanamid Co.,* 196 F.3d 1366, 1375 (Fed. Cir. 1999) (holding that plaintiff has "burden" to demonstrate a nexus between the infringement and the indirect profits before apportionment can occur). As a result, "modern cases more frequently deny profits earned from advertising." *Nimmer on Copyright* § 14.03[B][2][b] (citing *Deltak, Inc. v. Advanced Sys., Inc.*, 574 F. Supp. 400 (N.D. Ill. 1983) (Posner, J., sitting by designation), *vacated on other grounds*, 767 F.2d 357 (7th Cir. 1985) (explaining that increased sales arising from infringing advertising to be too speculative on the facts, while acknowledging that, in theory, an award may be appropriate in certain cases).

In a recent case, *Bell v. Taylor*, 827 F.3d 699 (7th Cir. 2016), the Seventh Circuit considered whether an award of defendant's profits was appropriate in a case involving

defendant's use of plaintiff's photograph in an online website advertising defendant's real estate services in the context of a motion to compel certain damages discovery. Affirming the district court's order, the Seventh Circuit expressly denied plaintiff's motion to compel certain damages discovery because "[t]here is no evidence suggesting that Cheatham attracted more clients because of Bell's photo." *Id.* at 710-11; *see also Eagle Servs. Corp. v. H2O Indus. Servs., Inc.*, 532 F.3d 620, 623 (7th Cir. 2008) ("It is doubtful that profits from the sale of noninfringing goods or services . . . can be attributed to a copyright infringement with enough confidence to support a judgment."); *Mackie*, 296 F.3d at 916 (rejecting plaintiff's request for defendant's profits based on defendant's use of an authorized photograph of plaintiff's sculpture in a promotional brochure, reasoning that "we can surmise virtually endless permutations to account for an individual's decision to subscribe to the Pops series, reasons that have nothing to do with the artwork in question").

Unlike in *Bell*, plaintiff, here, was actually allowed this discovery, and still she has no evidence that her illustrations attracted more customers or drove more sales of defendant's products, other than the fact that they continued to be used in subsequent videos made by Designomotion or by defendant itself, or individual illustrations otherwise appeared in online or other displays.[1] As the court described in its opinion on the parties' motions in *limine*, this general indication of value is *not* evidence supporting a causal nexus between the infringing use and defendant's revenues, even if limited to revenues for the products advertised. Instead, plaintiff would have had the jury infer that the portion of

---

[1] Plaintiff complained that the defendant was uncooperative during discovery, but the court gave plaintiff relief for defendant's failures to respond appropriately, and never followed up with an additional motion to compel, much less a motion for sanctions.

3

defendant's advertising budget spent on an entire video containing plaintiff's copyrighted illustrations, then multiplied by the number of other videos containing those same illustrations as a substitute for what defendant would have theoretically been willing to pay, combined with a series of additional assumptions of varying dubiousness, correlates to the revenues defendant obtained from the infringing use. (*See* 4/12/17 Op. & Order (dkt. #203) 16 (explaining that a damages theory based on defendant's profits that jumps "from a calculated portion of the advertising budget Flora would have spent on the alleged infringing use to an assumption that its advertising expense is directly proportional to net profits strikes the court as too speculative").) In addition, plaintiff failed to account for: other drivers of consumer sales, including general demand for alternative, health-related products generally and defendant's products in particular; further demand built by defendant's *authorized* use of plaintiff's illustrations in the English-language 7 Sources and, at least original, Flor-Essence videos; demand driven by other, non-infringing advertising; and a myriad of other factors.

At the proffer hearing before the damages phase of trial, plaintiff was unable to address the court's concern about these evidentiary gaps. In particular, plaintiff was unable to offer *any* evidence of customer surveys concerning what drove purchasing decisions, a marketing or damages expert discussing the role of two-dimensional art, like plaintiff's illustrations, in advertising as a driver of revenue, or earlier statements by defendant, customers or competitors about the value of those infringing illustrations in driving sales. Those rare cases awarding defendant's indirect profits as a supplement to actual damages appear to all offer this or similar evidence. *See, e.g., Frank Music Corp. v. Metro–Goldwyn– Mayer, Inc.*, 772 F.2d 505, 517 (9th Cir. 1985) (finding sufficient causal nexus between

profits and infringement demonstrated by casino's annual report, which stated that the operations of the casino were "materially enhanced" by the popularity of the infringing stage show (internal quotation marks omitted)); *Thornton v. J Jargon Co.*, 580 F. Supp. 2d 1261, 1268 (M.D. Fla. 2008) (allowing plaintiff to pursue indirect profits where evidence that actor's union required distribution of program containing infringing poem for play to go on); *Andreas v. Volkswagon of Am., Inc.*, 336 F.3d 789, 796-97 (8th Cir. 2003) (affirming award of defendant's profits for infringing advertising where plaintiff offered, among other evidence, that "Audi enthusiastically presented the commercial to its dealers as an important and integral part of its launch of the TT coupe into the U.S. market; [and] sales of the TT coupe during the period that the commercial aired were above Audi's projections").

In response to the court's concern, plaintiff would instead repeatedly point to *Davis v. The Gap, Inc.*, 246 F.3d 152 (2d Cir. 2001), for the proposition that plaintiff's limiting of defendant's profits to those involving the product lines promoted by the advertising containing infringing illustrations (7 sources, Flo-Essence and Floradix) created a sufficient causal nexus. In *Davis*, the Second Circuit considered whether plaintiff had appropriately apportioned the revenues from all sales by Gap, Inc., to just those implicated by the infringing advertisement. In finding that he had not, the court stated, "it was incumbent on Davis to submit evidence at least limited to the gross revenues of the Gap label stores, and perhaps also limited to eyewear or accessories. Had he done so, the burden would then have shifted to the defendant under the terms of § 504(b) to prove its deductible expenses and elements of profits from those revenues attributable to factors other than the copyrighted work." *Id.* at 160. Plaintiff reads this aside to be the equivalent of her limiting

5

revenues *only* to the designated product sales in order to shift the burden to defendant to demonstrate its costs.

Even if this were a fair reading of *Davis*, the plaintiff in that case did *more* by putting forth evidence of a spike in sales after the publication of the infringing advertisement. *Id.* at 159 ("Davis submitted evidence that, during and shortly after the Gap's advertising campaign featuring the 'fast' ad, the corporate parent of the Gap stores realized net sales of $1.668 billion, an increase of $146 million over the revenues earned in the same period of the preceding year."). As such, the Second Circuit could have been considering that evidence in stating that plaintiff's evidence of a limited revenue base would shift the burden to defendant to prove its costs. Regardless, given that the plaintiff in *Davis* did *not* put forth sufficient evidence to prove his indirect profits claim, the quote language is essentially *dicta*.

More importantly, plaintiff's reading of *Davis* would be inconsistent with Seventh Circuit cases requiring a copyright infringement plaintiff to put forth evidence of causation in the case of indirect profits beyond simply limiting the revenue basis to the indirect sales implicated by infringing advertising. *See, e.g.*, *Bell*, 827 F.3d at 710-11 (requiring the plaintiff to put forth evidence that the infringing photo drove clients to defendant before permitting discovery of defendant's revenues); *Eagle Servs. Corp.*, 532 F.3d at 623 ("[I]f Eagle had proved that H2O would have shut down had it not copied Eagle's manual, it could have obtained the profits that H2O obtained as a result of not having to shut down. It is doubtful that profits from the sale of noninfringing goods or services (in this case, H2O's clean-up services) can be attributed to a copyright infringement with enough confidence to support a judgment."); *see also Mackie*, 296 F.3d at 916 (Ninth Circuit case

6

cited widely by the Seventh Circuit; requiring evidence that infringing artwork in Symphony brochure caused individuals to subscribe to the Symphony). Absent *some* evidence tying defendant's revenues from the promoted product lines to the infringing videos, much less to plaintiff's copyrighted illustrations in those videos, a reasonable jury had no basis to award damages based on defendant's profits. Accordingly, the court excluded that damages theory.

**II. Mager's Expert Testimony on Royalty or Licensing Fee**

In its motions in *limine*, defendant also challenged plaintiff's expert Danny Mager's testimony on several basis, although the court rejected each, finding that: (1) he was qualified to testify based on his experience in the advertising industry; (2) defendant's specific challenges to the reliability of Mager's testimony could be addressed through cross-examination; and (3) Mager did not repudiate his 3 to 15% royalty rate opinion in testifying that such an analysis would not apply to a subcontractor relationship, given that Sullivan's damages theory was not based on the authorized use arrangement she had with Designomotion. (4/12/17 Op. & Order (dkt. #203) 9-13.)

While defendant offered an array of challenges, its challenge to the reliability of the 3 to 15% royalty rate was based on claimed contradictions in Mager's deposition testimony. In reviewing plaintiff's opposition to the motion, the court initially credited Mager's claimed reliance on industry standards set forth in his affidavit, particularly guidelines on pricing models issued by the American Institute of Graphic Arts. (*See* Mager Decl. (dkt. #193) ¶ 3; *id.*, Ex. 1 (dkt. #193-1).) However, upon further review of those guidelines, and Mager's inability to explain the reasons for his reliance on those percentages

during his proffer before the damages phase of trial, the court ultimately found that his testimony as to a "royalty range" was not sufficiently well-founded by experience, or trade-recognized practice to put before a lay jury. Indeed, Mager's testimony implicates many of the same concerns raised by Federal Circuit in rejecting a 25% "rule of thumb" royalty rate in the patent context. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1316 (Fed. Cir. 2011).

In his report, Mager simply states: "Standard royalty rates can vary quite a bit based on the product category (furniture, gift items, stationary, etc.). They may be as low as 3 percent or as high as 15 percent." (Mager Rept. (dkt. #132) 8.) Mager then goes on to explain how the range may vary further based on sales or the position of the licensor, and describes how some arrangements may guarantee a minimum amount. Mager then states, "If Flora were to pay Sullivan on a royalty basis, rather than a per use basis, it would typically be expected to pay her between 3% and 15% of net profit." (*Id.*)

There are several, significant short-comings with this superficial analysis. First, the range is quite significant. Mager offered the jury no basis for arriving at a number within this range to ground a damages award based on a royalty rate at least in part because he could offer no comparables. Second, Mager testified that the range varies based on product category, but then failed to explain where or why the health supplement product category would typically fall within this range. Third, Mager failed to provide any guidance on how the other factors he identified would apply in this case, including: the reputation or past performance of the licensor, the use of sales targets to guide a royalty rate, or whether a minimum guarantee would be in place. Fourth, Mager states in the body of his opinion that royalties are based on net sales (*e.g.*, gross sales adjusted for any returns or discounts),

8

but then states that the jury should award Sullivan a royalty based on "net profit." Even if this last were explained away as a simple error when he intended to say "net sales," this slip generally reflects the cursory treatment Mager provided in his report and proffer at trial.

There is, however, an even more fundamental shortcoming to Mager's opinion as to the award of a license based on a percentage of net sales, which was underscored during his proffer and that of plaintiff's counsel at trial: *all* of the examples of a payment based on a percent of sales revenues of products involved situations where the product itself infringed. This makes sense since a copyright is, at least arguably, directly driving sales, whether because of a registered design on a t-shirt, the label bottle or the illustration on a book jacket. Again, that is not the situation here at all, and Mager's, as well as plaintiff's, failure to offer a single example of a royalty paid as a percent of sales for advertising that might (or might not) indirectly affect sales of a non-infringing product is fatal to this theory of damages. As such, the court struck Mager's testimony as to the 3 to 15% royalty fee as unreliable.

Entered this 24th day of April, 2017.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge